Filed 8/5/24

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| MIRIAM GREISMAN,<br>        Plaintiff and Appellant,<br><br>v.<br><br>FCA US, LLC, et al.,<br>        Defendants and Respondents. | A166919<br><br>(Solano County<br>Super. Ct. No. FCS051933) |

Miriam Greisman bought a used 2014 Chrysler Town & Country, a vehicle that soon developed problems.  When the problems could not be successfully addressed by the manufacturer, Greisman filed a lemon law action under the Song-Beverly Consumer Warranty Act against the manufacturer and the dealer.  A mandatory settlement conference before the court was held over Zoom, at the conclusion of which the parties advised the judge that the case was settled for $100,000, a settlement confirmed on the record.

An issue arose as to whether the settlement amount was inclusive or exclusive of attorney fees, resulting in the parties filing competing motions, Greisman to reset the case on the trial court calendar (and/or other relief), defendants to enforce the settlement.  The trial court ordered an evidentiary

---

* Pursuant to California Rules of Court, rules 976(b) and 976.1, only the Background and Part I and Subheadings thereunder are certified for publication.

hearing on the settlement issue, which was held over four days. Following that hearing, the trial court filed an 11-page order approving the settlement—and finding that the $100,000 was inclusive of attorney fees. Greisman appeals. We affirm.

**BACKGROUND**

**The Setting**

In August 2015, Greisman purchased a used 2014 Chrysler Town & Country from CarMax Auto Superstores California, LLC (CarMax). The vehicle was manufactured by FCA US, LLC (FCA). Greisman paid $22,599, an amount she financed along with other expenses. In connection with her purchase, Greisman received a written warranty, including a three-year, 36,000 mile, bumper-to-bumper warranty and a five-year, 60,000 mile powertrain warranty that covered, among other things, the engine and transmission. The vehicle developed numerous mechanical issues, including oil light illumination, check-engine light illumination, loss of power, engine misfire, and rough running, issues the manufacturer FCA was unable to cure.

**The Lawsuit**

In November 2018, Greisman filed a complaint under the Song-Beverly Consumer Warranty Act (Civ. Code, § 1790, et seq.) naming two defendants, FCA and CarMax (collectively, defendants). The complaint alleged five causes of action, the first four of which were against FCA only, alleging claims under various Civil Code sections: (1) failure to repair within a reasonable number of opportunities (Civ. Code, § 1793.2, subd. (d)); (2) failure to commence repairs within a reasonable time and/or to repair the vehicle within 30 days (*id.*, subd. (b)); (3) failure to make available to authorized repair facilities sufficient service literature and replacement parts (*id.*, subd. (a)(3)); and (4) breach of express warranty. The fifth cause of action, alleged against both FCA and CarMax, was for breach of implied warranty of

2

merchantability.

Greisman was represented by Tionna Dolin of Strategic Legal Practices, APC (Strategic Legal), which firm remained Greisman's attorneys throughout the proceedings below, and Ms. Dolin and the firm are listed as co-counsel on appeal. In May 2022, the firm of Nemecek & Cole, APC associated in as Greisman's counsel, and remains so today, being the other co-counsel on her brief. In the course of the proceedings below at least seven different individual attorneys appeared on behalf of Greisman in pleadings or court appearances.

On January 11, 2019, represented by Schlichter & Shonack, LLP, CarMax filed a demurrer. The demurrer was overruled, and on June 3 CarMax filed its answer.

Meanwhile, on January 17, FCA had filed an answer. FCA was represented by Universal & Shannon, LLP, specifically Jon D. Universal of that firm, who remained counsel throughout and is co-counsel on appeal. On July 12, CarMax substituted Mr. Universal as its attorney in place of Schlichter & Shonack.

On July 11, Mr. Universal served a Code of Civil Procedure section 998 offer, an offer that stated it was from FCA on behalf of "itself and defendant CarMax." Defendants offered to pay Greisman $70,000 "[i]n exchange for the subject vehicle and a dismissal of this action with prejudice in its entirety" and, in addition, her "reasonable costs, expenses and attorney's fees based on actual time expended pursuant to Civil Code [section] 1794[, subdivision] (d) as stipulated by the parties, or if the parties cannot agree, upon motion to the court having jurisdiction over this action."

On May 27, 2020, Mr. Universal filed an amended answer on behalf of defendants in which they "admit[ted] [to] each and every allegation in the

3

complaint to the extent these answering defendants or its authorized repair facilities were unable to conform [Greisman's] vehicle to the applicable express warranties after a reasonable number of attempts." The amended answer further stated that defendants had "offered to reimburse" Greisman: "[Payment of] her actual damages under the Song-Beverly Consumer Warranty Act in the amount equal to the vehicle payments made by plaintiff, and including any charges for transportation and manufacturer-installed options, including any collateral charges such as sales tax, license fees, registration fees and other official fees, plus any incidental and consequential damages to which plaintiff is entitled, including but not limited to, reasonable repair, towing and rental car costs actually incurred by plaintiff, less that amount directly attributable to use by plaintiff prior to discovery of the nonconformities, plus the aggregate amount of costs and expenses, including attorney's fees, reasonably incurred in connection with the commencement and prosecution of this action, all pursuant to Civil Code sections 1793.2[, subdivision] (d) and 1794[, subdivision] (d). Defendants have also offered two times actual damages."

Greisman's opening brief asserts—an assertion apparently made to demonstrate how she would never accept $100,000 inclusive of her significant attorney fees—that "[n]otwithstanding the amended answer in which [defendants] . . . admitted liability . . . , the case went through over 17 months of additional intense litigation." Greisman's brief does not elaborate as to what that litigation involved—or which side was responsible for it.

Defendants have a different spin on this, asserting—an assertion apparently made to demonstrate that Greisman's conduct in the face of admitted liability was solely to generate attorney fees—that "[r]ather than joining in defendants' request for entry of judgment for the plaintiff, plaintiff

4

and her counsel chose to prolong the litigation and run up fees, pursuing discovery, and eventually bringing two motions for summary adjudication."

As to all that happened in the "17 months of additional intense litigation," what we glean from the record is that most of the litigation was caused by Greisman, a big chunk of which was for two motions for summary adjudication brought by her. Specifically:

On July 1, 2020, Greisman filed a motion for summary adjudication that with its supporting papers was almost 100 pages in length. The motion sought summary adjudication on Greisman's first cause of action, and by way of damages sought "$134,407.65 ([a]ctual damages of $37,935.91 + two times civil penalties of $75,871.82 + prejudgment interest of $20,599.91.)"

Defendants' opposition argued that Greisman had failed to produce evidence of her actual out-of-pocket costs, as required to determine her actual damages. Defendants also contended that the damage request included categories of damages unavailable as a matter of law.

The trial court denied the motion, finding "a triable issue of material fact regarding the amount of actual damages suffered by plaintiff."

Apparently undaunted, Greisman filed a second motion for summary adjudication, again with lengthy moving papers, this on the second cause of action for failure to effect repairs within 30 days and "including on the issue of the amount of damages." The motion contended that defendants' amended answer implicitly admitted liability on her second cause of action, and that defendants' offer in its answer to pay restitution and two time damages operated as a concession that Greisman was entitled to recover those amounts under her second cause of action.

Defendants' opposition argued among other things that Greisman's damages request again included disputed amounts.

5

The trial court denied this motion as well, holding that Greisman had "again" overlooked disputed damages issues and had failed to "present any evidence pertaining to any damages caused by the delay in repair."[1]

Shortly after denying the motion, the trial court scheduled a mandatory settlement conference (MSC) to take place on December 20, 2021 before the Honorable Christine A. Carringer. In advance of that conference, Greisman and FCA submitted MSC statements detailing their positions.

Greisman's statement set forth that she was seeking actual damages in the amount of $42,052.32 (the approximate total sale price of the vehicle), plus civil penalties in the amount of $84,104.64 (i.e., two times that amount of actual damages), for a total of $126,156.96. And separate from those claimed damages, Greisman's statement mentioned her entitlement to attorney fees, costs, and expenses but without indicating an amount. As Greisman's brief puts it, "[her] statement did not discuss the specific amount of the fees and costs she had incurred in the over three years of intense litigation."

FCA's statement, in a section entitled "FCA's MSC Position," stated that, "[w]ith liability and actual (plus civil penalties) damages, costs, attorney's fees and legal expenses all generally admitted, the only remaining issue is the specific amount of those damages." FCA disputed Greisman's calculations of actual damages by arguing that the

---

[1] The only other "litigation" apparent from the record (other than the case management conferences) is that Greisman filed a motion to compel further responses to requests for documents. The motion was denied for failure to meet and confer and also because the discovery was not relevant in light of the amended answer. Defendants were also awarded sanctions.

amount she had paid towards the vehicle was subject to deductions "for the 'negative equity' and other non-FCA accessories, including all interest which accrued on those amounts FCA [was] not legally obligated to pay." And as to Greisman's reasonably incurred attorney fees, costs, and expenses, FCA stated that those were to be determined "by negotiation or motion once FCA has an opportunity to review the actual billing records."

The MSC was held as scheduled, via Zoom, with Judge Carringer presiding. There were five participants: Greisman; her husband Irving Greisman; Rebecca Neubauer, Greisman's attorney; Mr. Universal, defendants' attorney; and Fred Sherwood, FCA's corporate representative. Certified court reporter Reyes F. Hunter was to record the proceedings. The conference lasted for some three hours, and was largely off the record.

The parties advised Judge Carringer that the case was settled for $100,000 and then went on the record to announce the terms, which we discuss in more detail below. This exchange followed:

"[JUDGE CARRINGER:] Am I correct, Mr. Universal, that that is the offer?

"MR. UNIVERSAL: Yes, in exchange for the vehicle.

"[JUDGE CARRINGER]: In exchange for the vehicle. I'm very sorry, I forgot this is a repurchase agreement.

"Ms. Neubauer, is that the agreement you reached?

"MS. NEUBAUER: Yes."

Judge Carringer next asked Greisman to confirm her understanding "that this is the end of the road as far as you are concerned; the vehicle is going to be repurchased, bought back by FCA, and whatever terms you have reached with your own attorneys and the law firm are between you and your attorney." Greisman responded, "Yes, Your Honor."

7

Judge Carringer then described what would occur following the settlement: the court would vacate the trial date and FCA would make payment to Greisman's counsel in approximately 60 days "assuming all the conditions are met in terms of the release and dismissal." And the hearing ended with Judge Carringer thanking the parties for putting the matter "to bed."

**The Cross-Motions**

After the MSC, court reporter Hunter provided an official transcript of it, which transcript indicated that Judge Carringer in announcing the settlement terms stated the following: "I am informed that the parties have agreed that defendants will pay the sum of $100,000 to Miriam Greisman in resolution of any and all claims arising from the lawsuit FCS051933; that is *exclusive* of all costs and attorney's fees." (Italics added.) Afterwards, court reporter Hunter submitted an errata sheet that corrected the transcript to reflect that Judge Carringer used the word "inclusive," not "exclusive," when announcing the settlement terms, and a dispute arose between the parties leading each side to file a motion on the issue.

On January 19, 2022, Greisman filed a motion to reset the trial and pretrial dates or, alternatively, for relief under Code of Civil Procedure sections 664.6 (section 664.6) and 473, subdivision (b) (section 473(b)). Greisman's motion was accompanied by four declarations, from: herself; her husband Irving; her attorney, Ms. Neubauer; and the chief operating officer of Strategic Legal, Shawn Pauli.

As explained in that motion, while Greisman remained willing to move forward with the settlement under the terms she agreed to at the MSC—i.e., $100,000 in damages, exclusive of attorney fees, costs, and expenses—she could not seek enforcement of the settlement because, contrary to the strict

8

requirements of section 664.6, neither of the two defendants personally consented to the settlement terms before the trial court and, as a result, neither party could enforce that settlement. Thus, Greisman argued, good cause existed for the trial court to reset the trial and pretrial dates. Alternatively, if the trial court were to determine that the settlement was enforceable under section 664.6, Greisman requested that the court enforce the settlement as reflected in the certified transcript without the unsigned "purported," errata sheet.

On February 25, defendants filed a motion under section 664.6 to enforce the settlement, which they contended was for $100,000 inclusive of attorney fees, costs, and expenses. The motion was supported by the declarations of Mr. Universal and FCA representative Sherwood, who clarified that he "was also authorized to represent and bind any settlement amount on behalf of CarMax . . . ."

Greisman filed opposition, arguing that the settlement was unenforceable, claiming that defendants' representative did not orally agree to it; that the court should enforce the settlement only if it is for payment of $100,000 exclusive of costs, contending that Judge Carringer used the word "exclusive" when announcing the settlement terms; and that any settlement for $100,000 would be void based on mistake of fact or a lack of a meeting of the minds.

On March 16, Greisman filed an ex parte application that Judge Carringer recuse herself from further proceedings in the case on the ground, among others, that Judge Carringer was a witness to the issues relating to the settlement and defendants' opposition to Greisman's motion "improperly attempted to prejudice Judge Carringer against [Greisman] by arguing that [she] was [criticizing] the court itself on how it handled the settlement."

9

Judge Carringer did recuse herself, and the case was transferred to the Honorable E. Bradley Nelson, who scheduled an evidentiary hearing on the motions for June 24. That hearing began on that day, and took place over four days, June 24 and 29, and August 10 and 30. Judge Nelson heard from five witnesses: Greisman; Irving Greisman; court reporter Hunter; Sherwood; and Pauli of Strategic Legal. Perhaps tellingly, Ms. Neubauer did not testify.

While the competing motions were pending, the parties learned that court reporter Hunter's stenographic software had generated an audio recording of the proceedings on the record at the MSC. Defendants moved to obtain the court reporter's testimony and to introduce the recording into evidence. Greisman opposed, claiming among other things that the recording was not relevant and that she would suffer "unfair surprise and undue prejudice" from the recording's admission.

On August 10, Judge Nelson ordered the court reporter "to produce the original audio recording to the court and make copies to distribute to the parties within [five] business days." An "[a]udio copy" was "to be uploaded to DropBox" and the "[p]hysical original to be delivered to the court." As she would come to testify, court reporter Hunter provided a CD-ROM disk to the court and uploaded the audio recording to Dropbox, which the court shared with the parties' attorneys. Judge Nelson admitted into evidence the CD-ROM, which he understood to contain the same recording that had been uploaded to Dropbox and shared with counsel, concluding that the reporter had provided adequate foundation for the recording's admission.[2] However,

---

[2] We previously granted defendants' unopposed motion to augment the record to include the audio file that was uploaded to Dropbox. Because it was

10

Judge Nelson could not listen to the recording because the CD-ROM turned out to be blank.

On November 2, Judge Nelson issued an 11-page order holding that the settlement announced by Judge Carringer was "inclusive" of "Plaintiff[']s attorney's fees and costs," and that the parties themselves personally agreed to the settlement, setting forth the evidence supporting that decision.

First, Judge Nelson credited the transcript as corrected by an errata from court reporter Hunter as reflecting an "inclusive" settlement. The court reporter had confirmed the errata's accuracy by consulting her contemporaneous stenographic notes and a recording, both of which "reflected that Judge Carringer had used the word 'inclusive,' and not the word 'exclusive.'" Judge Nelson emphasized that "both sides acknowledged listening to [the recording] outside the court's presence and neither contended that the word 'exclusive' was used by Judge Carringer in that recording." Moreover, he reasoned, an "exclusive" settlement would have been inconsistent with Judge Carringer's instruction to Greisman that "whatever terms you have reached with your own attorneys and the law firm are between you and your attorney."

Judge Nelson further noted that Greisman and her attorney Ms. Neubauer offered inconsistent testimony about the settlement terms. That is, Greisman initially testified that she did not recall whether Judge

_____

lodged with the trial court, the audio recording is a proper component of the record on appeal. (Cal. Rules of Court, rule 8.155(a)(1)(A) (further "rule" references are to the California Rules of Court); see Eisenberg, et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Guide 2023) ¶ 5:134; *id.*, ¶ 5:135 ["the documents sought to be added to the record need not have been offered or used in the trial proceedings, so long as they were on file or lodged with the superior court"], citing rule 8.155(a)(1)(A) and *People v. Preslie* (1977) 70 Cal.App.3d 486, 490.)

11

Carringer used the word exclusive or inclusive, but then claimed to recall the judge had used the word exclusive. However, Pauli of Strategic Legal testified that his colleague Ms. Neubauer had informed other attorneys at their firm that she could not recall whether the court used the word inclusive or exclusive following the MSC, but Ms. Neubauer's "later filed declaration . . . attested that Judge Carringer used the word 'exclusive.' "

Judge Nelson also concluded that the evidence satisfied the statutory requirements for an enforceable settlement. He first found that Sherwood represented both FCA and CarMax, and accepted the settlement terms on behalf of both. He then found that Sherwood had adequately communicated assent to the agreement on the defense side, and that Sherwood was present, and did not object, when his attorney confirmed agreement to the terms of the settlement on the record.

Judge Nelson further noted that an attorney for a represented party may sign a writing settling pending litigation on his or her client's behalf under section 664.6 and that the statute "contains no limitation restricting that authority to the execution of written settlement agreements or precluding the exercise of that authority orally on the record in open court." The express, on-the-record assent of defendants' attorney, Mr. Universal, was thus sufficient to render the agreement enforceable under section 664.6.

On December 16, Greisman filed an appeal from the " 'Order/Judgment' enforcing purported settlement under . . . section 664.6 . . . ." Judge Nelson entered final judgment on January 20, 2023.[3]

---

[3] We previously granted Greisman's unopposed motion to augment the record to include the judgment. Although Greisman's notice of appeal identifies the "Order/Judgment enforcing purported settlement," the notice was filed before the judgment was entered, making the appeal premature.

## DISCUSSION

### Part I:  The Trial Court Did Not Err In Entering Judgment, Pursuant to Section 664.6, Enforcing the Stipulated Settlement

*General Legal Principles and the Standard of Review*

Section 664.6 states, in relevant part:  "If parties to pending litigation stipulate, in a writing signed by the parties outside of the presence of the court or orally before the court, for settlement of the case, or part thereof, the court, upon motion, may enter judgment pursuant to the terms of the settlement."  (Code Civ. Proc., § 664.6, subd. (a), as amended by Stats. 2020, ch. 290, § 1, eff. Jan. 1, 2021.)

The purpose of section 664.6 is "to provide a summary procedure for specifically enforcing a settlement contract without the need for a new lawsuit."  (*Weddington Productions, Inc. v. Flick* (1998) 60 Cal.App.4th 793, 809 (*Weddington*).)  "If the court determines that the parties entered into an enforceable settlement, it should grant the motion and enter a formal judgment pursuant to the terms of the settlement."  (*Hines v. Lukes* (2008) 167 Cal.App.4th 1174, 1182–1183 (*Hines*); see Code Civ. Proc., § 664.6, subd. (a).)

On appeal, "[a] trial court's factual findings on a motion to enforce a settlement pursuant to section 664.6 are subject to limited appellate review and will not be disturbed if supported by substantial evidence."  (*Machado v. Myers* (2019) 39 Cal.App.5th 779, 790; accord, *In re Marriage of Assemi* (1994) 7 Cal.4th 896, 911.)

Regarding the substantial evidence standard, the principles are well settled:  " '[T]he power of an appellate court begins and ends with a

---

However, we exercise our discretion to treat the appeal as filed immediately after entry of judgment.  (Rule 8.104(d)(2); see *Saffer v. JP Morgan Chase Bank, N.A.* (2014) 225 Cal.App.4th 1239, 1245, fn. 4.)

13

determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the findings below. [Citation.] We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor . . . ." (*Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660 (*Jessup*).) Stated another way, an appellate court does not evaluate the credibility of the witnesses or otherwise reweigh the evidence. (*Barboni v. Tuomi* (2012) 210 Cal.App.4th 340, 349 (*Barboni*).) Rather, "we defer to the trier of fact on issues of credibility." (*Lenk v. Total-Western, Inc.* (2001) 89 Cal.App.4th 959, 968 (*Lenk*).) "If the trial court's resolution of the factual issue is supported by substantial evidence, it must be affirmed." (*Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632.) "Our job is only to see if substantial evidence exists to support the [decision] in favor of the prevailing party, not to determine whether substantial evidence might support the losing party's version of events." (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 582.)

Legal questions, such as the proper interpretation of section 664.6 or whether the granting of the motion satisfied the strict requirements of the statute, are reviewed de novo. (*J.B.B. Investment Partners, Ltd. v. Fair* (2014) 232 Cal.App.4th 974, 984 (*J.B.B.*).)

### *The Stipulated Settlement Met the Statutory Requirements*

According to Greisman, no oral settlement can be enforced under section 664.6 unless the parties themselves, not just their attorneys, stipulate to settle. And because defendants' attorneys, not defendants themselves, consented to the oral settlement in this case, Greisman argues the trial court erred in granting the motion to enforce the settlement under section 664.6. We disagree.

Greisman's contention presents a question of statutory interpretation,

14

which, as noted, we review de novo. (*J.B.B., supra,* 232 Cal.App.4th at p. 984.) " 'As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose.' " (*Skidgel v. California Unemployment Ins. Appeals Bd.* (2021) 12 Cal.5th 1, 14.) " 'We begin by examining the statutory language, giving it a plain and commonsense meaning.' " (*Ibid.*) " 'If the statutory language is unambiguous, then its plain meaning controls. If, however, the language supports more than one reasonable construction, then we may look to extrinsic aids, including the ostensible objects to be achieved and the legislative history.' " (*Ibid.*) Another relevant principle of interpretation is that we presume the Legislature is aware of judicial decisions and enacts and amends statutes in the light of that knowledge. (*Leider v. Lewis* (2017) 2 Cal.5th 1121, 1135.) Thus, we view the current version of section 664.6 against the statutory and decisional developments preceding it.

Prior to January 1, 2021, section 664.6 provided in its entirety: "If *parties* to pending litigation stipulate, in a writing signed by the parties outside the presence of the court or orally before the court, for settlement of the case, or part thereof, the court, upon motion, may enter judgment pursuant to the terms of the settlement." (Stats. 1981, ch. 904, § 2, p. 3437, italics added.)

In *Levy v. Superior Court* (1995) 10 Cal.4th 578 (*Levy*), our Supreme Court addressed "whether the Legislature intended the term 'parties' as it appears in section 664.6 . . . to mean only the litigants personally or to include the attorneys representing the litigants." (*Id.* at p. 582.) The court initially determined the word " 'parties' " was ambiguous. (*Ibid.*) After examining the statutory context, the court interpreted "parties" literally to mean the litigants themselves, not the litigants' attorneys of record. (*Id.* at

15

p. 586.)  It reasoned that because a settlement of a lawsuit implicates a substantial right of the litigants, "in providing for an enforcement mechanism for settlements by 'parties,' the Legislature intended the term to literally mean the litigants personally." (*Id*. at p. 584.)  Applying that interpretation to the facts before it—where the litigants' attorneys, not the litigants themselves, had executed a purported written settlement agreement—the court held the agreement was not enforceable under section 664.6. (*Levy*, at p. 586.)

Subsequently, *Johnson v. Department of Corrections* (1995) 38 Cal.App.4th 1700, 1707–1708 held that the *Levy* requirement applied to oral settlements recited before the court.  (See *Critzer v. Enos* (2010) 187 Cal.App.4th 1242, 1254–1258; *Murphy v. Padilla* (1996) 42 Cal.App.4th 707, 716.)

Effective January 1, 2021, before the December 2021 stipulation in this case, the Legislature passed Assembly Bill No. 2723 (2019–2020 Reg. Sess.), which amended section 664.6.  It now states, in relevant part:  "(a) If parties to pending litigation stipulate, in a writing signed by the parties outside of the presence of the court or orally before the court, for settlement of the case, or part thereof, the court, upon motion, may enter judgment pursuant to the terms of the settlement. . . .

"(b) For purposes of this section, a writing is signed by a party if it is signed by any of the following:  [¶] (1) The party.  [¶] (2) An attorney who represents the party.  [¶] (3) If the party is an insurer, an agent who is authorized in writing by the insurer to sign on the insurer's behalf." (Stats. 2020, ch. 290, § 1.)[4]

---

[4] Effective January 1, 2024, after the judgment was entered in this case, Assembly Bill No. 1756 (2023–2024 Reg. Sess.) amended section 664.6,

16

Here, as Judge Nelson observed, "[section 664.6] was amended effective January 1, 2021, to expressly allow an attorney for a represented party to sign a writing settling pending litigation on his or her client's behalf. It contains no limitations restricting that authority to the execution of written settlement agreements or precluding the exercise of that authority orally on the record in open court." Based on this construction, he concluded that the express, on-the-record assent of Greisman, her attorney, and defendants' attorney to settle the case was sufficient to satisfy the requirements of section 664.6.

In arguing the contrary, Greisman relies on the maxim *expressio unius est exclusio alterius*, which means "the expression of one thing . . . ordinarily implies the exclusion of other things." (*In re J.W.* (2002) 29 Cal.4th 200, 209.) Doing so, Greisman argues that "Section 664.6's recent amendment did not extend the broader definition of 'party' set forth in subdivision (b) to oral stipulations before the court. Notwithstanding the Legislature's decision to make an exception for 'a writing signed by [a] party,' the amended statute's reference to 'parties' still means the litigants themselves as it relates to oral stipulations before the court." We are unpersuaded.

*Expressio unius est exclusio alterius* "is not applied in isolation, without regard to 'legislative history or other evidence of legislative intent,' but rather must be considered with regard to 'other indicia of legislative intent.' [Citation.]" (*People v. Alaybue* (2020) 51 Cal.App.5th 207, 218, citing *In re J.W., supra*, 29 Cal.4th at p. 209.) Indeed, courts should " 'not apply the

---

subdivision (b)(3) to state: "If an insurer is defending and indemnifying a party to the action, an agent who is authorized in writing by the insurer to sign on the party's behalf. This paragraph does not apply if the party whom the insurer is defending would be liable under the terms of the settlement for any amount above the policy limits." (Stats. 2023, ch. 478, § 12.)

*expressio unius est exclusio alterius* principle 'if its operation would contradict a discernable and contrary legislative intent." [Citations.]' " (*People v. Alaybue*, at p. 218, citing *In re J.W.*, at pp. 209–210.)

"To determine what purpose the Legislature intended [section 664.6] to serve, we consider its legislative history." (*In re J.W., supra*, 29 Cal.4th at p. 210.) As defendants point out, the legislative history of section 664.6 includes legislative committee analyses of Assembly Bill No. 2723.[5] And we agree with defendants that these materials refute Greisman's interpretation of the statute.

The analyses from both the Senate Rules Committee and the Senate Judiciary Committee discuss the *Levy* decision and state that "[c]urrently, Section 664.6 requires that the *parties* must stipulate to the settlement underlying the motion." (Sen. Rules Com., Off. of Sen. Floor Analyses, Analysis of Assem. Bill No. 2723 (2019–2020 Reg. Sess.) as amended Aug. 20, 2020 (Senate Rules Committee Analysis), p. 5; Sen. Com. on Judiciary, Analysis of Assem. Bill No. 2723 (2019–2020 Reg. Sess.) as amended May 4, 2020 (Senate Judiciary Committee Analysis), pp. 4–5.) The analyses then state: "This bill eliminates the requirement that parties themselves must personally sign or *orally stipulate* to these settlements and instead allows counsel for the parties to so stipulate on their behalf and further authorizes agents of insurers to stipulate on the insurer's behalf." (Senate Rules Committee Analysis, *supra*, at p. 5, italics added; Senate Judiciary Committee Analysis, *supra*, at pp. 5-6, italics added.)

The analyses from the Senate Rules Committee and the Senate

---

[5] We take judicial notice of these legislative materials on our own motion. (See *In re J.W., supra*, 29 Cal.4th at p. 211 ["To determine the purpose of legislation, a court may consult contemporary legislative committee analyses of that legislation, which are subject to judicial notice"].)

18

Judiciary Committee describe the purpose of the legislation in this way: "Principles of efficiency and economy promote the settlement of civil disputes by the parties, involving the court and expending its resources only where absolutely needed.  This bill seeks to streamline the procedure provided for in Section 664.6 by explicitly granting the authority to stipulate to settlements to attorneys, on behalf of the parties they represent, and to agents of insurers, where the insurer is a party to the settlement.  However, *this removes the existing procedural protection requiring more direct client involvement*." (Senate Rules Committee Analysis, *supra*, at p. 4, italics added; Senate Judiciary Committee Analysis, *supra*, at p. 4, italics added.) The analyses further state: "*The virtues outlined by the Supreme Court notwithstanding*, the author and the sponsor . . . now seek to streamline this process in order to meet the goals of efficiency and economy." (Senate Rules Committee Analysis, *supra*, at p. 5, italics added; Senate Judiciary Committee Analysis, *supra*, at p. 5, italics added.)

These legislative committee analyses confirm that the Legislature intended to eliminate the requirement in *Levy* (and, by extension, its progeny) that parties must personally sign or *orally stipulate* to settle a case. "In the end, a court must adopt the construction most consistent with the apparent legislative intent and most likely to promote rather than defeat the legislative purpose and to avoid absurd consequences." (*In re J.W.*, *supra*, 29 Cal.4th at p. 213.)  Here, to promote rather than defeat the legislative purpose to depart from the *Levy* decision and to streamline the settlement process, we hold that, as applied to oral settlements stipulated before the court, current section 664.6 does not require that the parties themselves orally stipulate, and instead allows counsel for the parties to orally stipulate on their behalf.

19

Applying that interpretation to the facts here, there is no dispute that the attorneys for both parties, in addition to Greisman herself, orally stipulated to settle the case before Judge Carringer at the MSC.  This, as the trial court found, was sufficient to satisfy the requirement that the parties "stipulate . . . orally before the court, for settlement of the case." (§ 664.6, subd. (a).)

### Part II:  There Was Sufficient Evidence to Support the Existence of an Enforceable Settlement Agreement

We next consider Greisman's arguments that no enforceable settlement agreement was formed because the parties did not agree upon all material terms.

"A court ruling on a motion under . . . section 664.6 must determine whether the parties entered into a valid and binding settlement.  [Citations.] A settlement is enforceable under section 664.6 only if the parties agreed to all material settlement terms." (*Hines, supra*, 167 Cal.App.4th at p. 1182, fn. omitted.)  "[I]n determining whether the parties entered into a binding settlement of all or part of a case, a trial court should consider whether (1) the material terms of the settlement were explicitly defined, (2) the supervising judicial officer questioned the parties regarding their understanding of those terms, and (3) the parties expressly acknowledged their understanding of an agreement to be bound by those terms." (*In re Marriage of Assemi, supra,* 7 Cal.4th at p. 911.)  The trial court may consider declarations of the parties and their counsel, any transcript of the stipulation orally presented, and recorded by a certified reporter, and any additional oral testimony. (*Hines*, at p. 1182.)  As mentioned, we review the trial court's determination for substantial evidence. (*In re Marriage of Assemi*, at p. 911.)

Here, Judge Nelson's determination that the parties entered into a binding settlement agreement is supported by substantial evidence.  Read

20

together, the minute order for the MSC, the transcript of the MSC, and the errata thereto plainly establish that the parties agreed to settle this case for $100,000, inclusive of attorney fees and costs. Those documents show that the parties, represented by counsel, engaged in settlement negotiations during the MSC; advised Judge Carringer of their desire to enter into a settlement disposing of the lawsuit; and that Judge Carringer announced on the record that defendants were to pay Greisman the sum of $100,000, "inclusive" of attorney fees and costs. In response to Judge Carringer's inquiry, Greisman, her attorney, and defendants' attorney expressly stated they understood and agreed to those terms. Additionally, Greisman confirmed her understanding "that this is the end of the road as far as you are concerned; the vehicle is going to be repurchased, bought back by FCA, and whatever terms you have reached with your own attorneys and the law firm are between you and your attorney."

In sum, the record establishes that the material terms of the settlement agreement were clear, specific, and placed on the record, that Greisman, her attorney, and defendants' attorney confirmed their understanding of the terms, and that they unequivocally gave their personal assent thereto. Accordingly, substantial evidence supports the trial court's finding that the parties entered into a valid and binding settlement agreement. (Cf. *In re Marriage of Assemi*, *supra*, 7 Cal.4th at p. 911 [substantial evidence showed the parties entered into a binding settlement agreement where "the parties, represented by counsel, engaged in settlement negotiations over an extended period of time, advised the retired judge of their desire to enter into a settlement disposing of all the matters that were to be arbitrated, explicitly defined and placed on the record the terms of the settlement, and, in response to [the judge's] inquiry expressly stated they understood and agreed to those

21

terms"].)

Greisman nonetheless argues that insufficient evidence demonstrates the parties agreed that the settlement was inclusive of attorney fees and costs. Among other things, she challenges the veracity of the errata sheet to the transcript of the MSC and Judge Nelson's reliance on it. She also asserts the settlement was void because the parties did not reach "a meeting of the minds" on all material terms of the settlement.

Initially, we observe that Greisman's arguments are based on a recitation of the record that is in disregard of settled principles of appellate review, ignoring the rule that the evidence must be viewed most favorably to defendants, the prevailing party, and in support of the judgment. (*Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, 429.) As another leading case would put it, " 'It is well established that a reviewing court starts with the presumption that the record contains evidence to sustain every finding of fact.' [Citations.] . . . A recitation of only [Greisman's] evidence is not the 'demonstration' contemplated under the above rule. [Citation.] Accordingly, if, as [Greisman] here contend[s], 'some particular issue of fact is not sustained, [she] [is] required to set forth in [her] brief all the material evidence on the point and not merely [her] own evidence. Unless this is done the error is deemed to be waived.' " (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.) Greisman's arguments can be deemed waived.

They also have no merit.

Greisman contends there was no "reasonable" or "credible" evidence supporting the trial court's reliance on the errata sheet to the transcript of the MSC. Greisman attacks the veracity of the errata sheet and Ms. Hunter, the court reporter who prepared it, in a number of respects. For example,

22

Greisman points out that Ms. Hunter had ex parte emails with defendants' attorney prior to issuing the errata sheet, accuses Ms. Hunter of lying during the evidentiary hearing, and complains that the errata sheet "was marred with flaws." Such arguments are nothing more than a request we reweigh the evidence and resolve credibility issues, which, as explained above, is not our role. Instead, we must defer to the trial court's resolution of any conflicts in the evidence and credibility disputes. (See *Jessup, supra*, 33 Cal.3d at p. 660; *Barboni, supra,* 210 Cal.App.4th at p. 349; *Lenk, supra*, 89 Cal.App.4th at p. 968.)

Here, Judge Nelson's order reflects that he found court reporter Hunter credible, a credibility determination supported by ample evidence. As Ms. Hunter testified, she had confirmed the errata's accuracy by consulting her contemporaneous stenographic notes and a recording, both of which "reflected that Judge Carringer had used the word 'inclusive,' and not the word 'exclusive.' "

Although Greisman attempts to make much of the fact that Ms. Hunter and defendants' attorney, Mr. Universal, had ex parte emails regarding the transcript, Judge Nelson nonetheless found Ms. Hunter credible. Indeed. In their emails, Mr. Universal wrote: "[W]hy does the transcript say the settlement was exclusive of costs, fees and expenses? The settlement was to be inclusive of costs, fees and expenses? We covered that 3 times at the settlement conference. *Please check with the judge*." (Italics added.) Viewing the email in context, in combination with evidence that Ms. Hunter independently reviewed her notes and the audio recording before issuing the errata sheet, Judge Nelson could reasonably conclude that Ms. Hunter caught the error without being pressured into correcting the transcript.

Greisman also argues the "court's inference regarding the content of

the audio tape was based on mere speculation and conjecture." (Capitalization and emphasis omitted.) Greisman argues that court reporter Hunter's testimony "was vague and confusing" as to the software used to record the MSC and the manner in which she maintained the recording. Greisman also points to the fact that the CD-ROM, which purportedly contained the audio recording of the MSC and was admitted into evidence, turned out to be blank, preventing Judge Nelson from listening to the audio recording. Greisman concludes that it was thus speculative for him to infer "that the purported audio must have captured Judge Carringer using the word 'inclusive.' "

Greisman's argument appears to challenge the foundation of the recording, which argument Judge Nelson rejected when he denied her motion to strike the recording for lack of foundation. Greisman fails to show this was an abuse of discretion, and we perceive none. (See *Marin v. Department of Transportation* (2023) 88 Cal.App.5th 529, 536 [evidentiary rulings are reviewed for abuse of discretion].) Court reporter Hunter testified that her recording device contains software that captured audio, though she did not know precisely how the software operated. She also testified that the software generated an audio recording of the MSC proceedings, that she listened to the recording, and that the recording matched her stenographic notes. Based on this, Judge Nelson reasonably concluded that the recording was a "fair and accurate depiction of the proceedings" and appropriately denied Greisman's motion to strike.

Moreover, although Judge Nelson could not listen to the audio recording, for the reasons stated above, he was entitled to accept court reporter Hunter's testimony about the contents of the recording. Indeed, as he found, "both sides acknowledged listening to it outside the court's presence

24

and neither contended that the word 'exclusive' was used by Judge Carringer in that recording."[6]

We turn to Greisman's claim there was "no meeting of the minds" concerning all of the material terms of the settlement. As we understand it, Greisman is presumably renewing this argument she made below: "[I]f the Court were to determine that the settlement met the requirements of section 664.6 and that the $100,000 settlement amount was 'inclusive' of the fees, costs and expenses, [Greisman] requests that the Court set aside that purported agreement as void *ab initio* because there was no 'meeting of the minds' to form an enforceable agreement and [she] never consented to settle her claims for $100,000, inclusive of . . . $100,000 in fees, costs and expenses . . . ."

There are several problems with Greisman's argument. For one, the argument is hard to follow, perhaps because it is inherently inconsistent on its face. If the argument accepts the existence of a settlement that is inclusive of attorney fees and costs and complies with section 664.6, then it would be logically contradictory to argue at the same time there was no settlement formed due to a lack of mutual consent. Either a settlement agreement existed or it did not. (See *Weddington*, *supra*, 60 Cal.App.4th at p. 797 ["If no meeting of the minds has occurred on the material terms of a contract," then "no contract formation has occurred"].)

Second, Greisman's argument is based on facts from which we are asked to draw inferences contrary to those drawn by Judge Nelson. In particular, she asks us to infer, based on certain evidence of the "objective

---

[6] Although not necessary to our decision, we note that our own review of a copy of the audio recording (which we have augmented the record to include) additionally confirms that Judge Carringer used the word "inclusive," not "exclusive," when announcing the terms of the settlement.

manifestations" of the parties' intent, that they "intended to settle the case for $100,000 in damages in exchange for [the] return of the vehicle, with the amount of Greisman's attorney's fees and costs to be determined separately through stipulation or motion for fees." Among other things, she relies on the parties' MSC statements, which she claims focused on damages and left the amount of attorney fees for future negotiations or motions, as well as FCA's 2019 section 998 offer to settle for $70,000 in damages and Greisman's rejection thereof.

Even if we were to draw some inferences favorable to Greisman, this would at best create a conflict in the evidence. However, "[t]he fact that it is possible to draw some inference other than that drawn by the trier of fact is of no consequence." (*Jessup*, *supra*, 33 Cal.3d at p. 660.) As stated above, we must view the evidence in the light most favorable to the judgment, giving it the benefit of every reasonable inference and resolving all conflicts in its favor. (*Ibid.*) Doing so, we conclude substantial evidence shows the parties mutually assented to settle the case for $100,000 inclusive of attorney fees and costs. We have already concluded that Judge Nelson was entitled to find that the settlement announced by Judge Carringer on the record was inclusive of attorney fees and costs. And it is undisputed that defendants' attorney, Greisman's attorney, and Greisman verbally assented to the settlement terms as announced by Judge Carringer. The parties' clear, unequivocal, and on-the-record expressions of assent to the settlement terms as recited by Judge Carringer supply substantial evidence of the requisite mutual assent.

Finally, we briefly address Greisman's repeated assertion that "[i]t would have made no sense" for her to agree to settle her case for $100,000, inclusive of attorney fees, costs, and expenses, when the amount of the fees

26

"alone exceeds $100,000." Passing over whether this claim is factually supported,[7] Greisman in essence asserts that the settlement was not sufficiently favorable to her, which indicates she would not have agreed to it. Regardless of whether it "made sense" or was in Greisman's best interest to enter into the agreement, the record supports that she in fact did. If in hindsight she feels she made a bad bargain, we cannot save her from it: "No matter how toothless the agreement may seem in retrospect, it is not the province of the trial court to rewrite it and put in the teeth the complaining side now thinks it should have had." (*Viejo Bancorp, Inc. v. Wood* (1989) 217 Cal.App.3d 200, 207; see *Apra v. Aureguy* (1961) 55 Cal.2d 827, 830–831.)

For all these reasons, Judge Nelson did not err in entering judgment pursuant to section 664.6 enforcing the stipulated settlement.

### Part III: Greisman's Other Arguments Fail to Establish Reversible Error

As alternative arguments, Greisman claims she is entitled to relief under section 473(b), that the settlement should be rescinded based on mistake of fact, and that the settlement violates Civil Code section 1790.1. We reject all of these arguments.

#### *Civil Code Section 1790.1*

We start with Greisman's claim under Civil Code section 1790.1. That section states: "Any waiver by the buyer of consumer goods of the provisions of this chapter, except as expressly provided in this chapter, shall be deemed

---

[7] In support of her claim, Greisman cites to the declaration of attorney Neubauer, who stated: "the amount of the attorney's fees, costs and expenses that [Strategic Legal] has incurred to date alone exceeds $100,000." Ms. Neubauer's declaration, however, failed to mention any work that was performed by her law firm, much less elaborate whether the work was reasonable. Nor did she substantiate her statement with billing records evidencing the nature or extent of the legal work.

contrary to public policy and shall be unenforceable and void." Greisman then cites to Civil Code section 1794, subdivision (d), which states: "If the buyer prevails in an action under this section, the buyer shall be allowed by the court to recover as part of the judgment a sum equal to the aggregate amount of costs and expenses, including attorney's fees based on actual time expended, determined by the court to have been reasonably incurred by the buyer in connection with the commencement and prosecution of such action." Greisman asserts—without citation to the record—that "[t]he settlement agreement enforced by the [trial] court deprived [her] of her statutory right to seek mandatory attorneys' fees, costs, and expenses that her attorneys reasonably incurred in the over 3 years of intense litigation."

Defendants argue Greisman has forfeited this claim because she never raised Civil Code section 1790.1 below. In her reply brief, Greisman does not dispute she did not raise the argument, but claims she may do so for the first time on appeal because it "presents a pure question of law." We agree that Greisman's claim has been forfeited.

" ' "As a general rule, theories not raised in the trial court cannot be asserted for the first time on appeal; appealing parties must adhere to the theory (or theories) on which their cases were tried. This rule is based on fairness—it would be unfair, both to the trial court and the opposing litigants, to permit a change of theory on appeal." ' [Citation.]" (*Hewlett-Packard Co. v. Oracle Corp.* (2021) 65 Cal.App.5th 506, 548.) Therefore, a party who fails to raise a claim in the trial court waives such claim on appeal. (*Greenwich S.F., LLC v. Wong* (2010) 190 Cal.App.4th 739, 767 (*Greenwich*).) Although Greisman invokes the rule that appellate courts have discretion to consider a theory or issue raised for the first time on an appeal where it presents a pure question of law (*ibid.*), that rule does not apply here.

Greisman's argument under Civil Code section 1790.1 is that she has been denied her statutory right to recover attorney fees and costs "based on actual time expended" and "determined by the court to have been reasonably incurred." (Civ. Code, § 1794, subd. (d).) Whether the claimed fees and costs were based on actual time expended and whether they were reasonably incurred are highly factual questions that are more appropriately left to the trial court in the first instance.

### *Section 473(b)*

Section 473(b) provides, in relevant part: "The court may, upon any terms as may be just, relieve a party or his or her legal representative from a judgment, dismissal, order, or other proceeding taken against him or her through his or her mistake, inadvertence, surprise, or excusable neglect." The extent of Greisman's argument based on this section is this one sentence: "Greisman is also entitled to relief under . . . section 473(b) because her 'consent' to the purported settlement resulted from an excusable mistake— *i.e.*, an apparent confusion regarding the terms 'inclusive' and 'exclusive' while attending a court proceeding via Zoom."

This argument violates several rules of appellate procedure. First, this argument is not presented under a separate heading in Greisman's opening brief. Rather, it is presented under the heading entitled, "The Trial Court Ignored Objective Evidence Of the Lack of a Meeting Of the Minds," an issue legally distinct from whether section 473(b) relief was available. The failure of Greisman to confine her arguments to the point raised in the heading violates rule 8.204(a)(1)(B). (See *Provost v. Regents of University of California* (2011) 201 Cal.App.4th 1289, 1294.)

Second, Greisman fails to provide any citations to facts in the record to support her argument. Rule 8.204(a)(1)(C) requires that any reference to a matter in the record, whether factual or procedural, be supported by a

29

citation to the volume and page number of the record where the matter appears.  Failure to do so allows us to disregard the contention.  (*Professional Collection Consultants v. Lauron* (2017) 8 Cal.App.5th 958, 970; *Myers v. Trendwest Resorts, Inc.* (2009) 178 Cal.App.4th 735, 745.)

Third, Greisman's argument is devoid of any meaningful legal analysis.  " 'Appellate briefs must provide argument and legal authority for the positions taken. "When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived." ' "  (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956.)  Although Greisman develops her argument in her reply brief, it comes "too late."  (*Aviel v. Ng* (2008) 161 Cal.App.4th 809, 821 ["[Appellants] attempt, in their reply brief, to develop the argument, but it is too late.  We disregard issues not properly addressed in the appellant's opening brief"].)

In any event, Greisman's argument under section 473(b) fails on the merits.

Initially, although Judge Nelson did not expressly address Greisman's section 473(b) argument in his order, we presume he considered and rejected it.  (See *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 [" 'A judgment or order of the lower court is *presumed correct*.  All intendments and presumptions are indulged to support it on matters as to which the record is silent . . .' "].)  The question, then, is whether the trial court abused its discretion in doing so.  (See *Zamora v. Clayborn Contracting Group, Inc.* (2002) 28 Cal.4th 249, 257 [ruling on a motion for discretionary relief under section 473 is reviewed for abuse of discretion].)

Greisman does not argue that Judge Nelson abused his discretion in denying her relief.  Nor could she demonstrate he did.  A moving party

seeking relief under section 473(b) has the burden "to demonstrate 'that due to *some mistake*, either of fact or of law, of [her]self or of [her] counsel, or through *some inadvertence*, surprise or neglect which may properly be considered excusable, the judgment or order from which [s]he seeks relief should be reversed.' [Citation.]" (*Hopkins & Carley v. Gens* (2011) 200 Cal.App.4th 1401, 1410.)  It is simply not enough to assert a general state of mistake; the moving party must specify the actual cause of the mistake *and* explain why it should be excused.  (See *ibid*.)  Greisman failed to make these showings.  Not only are her contentions in her opening brief based on general and vague claims of mistake, but also, she provides no reasonable excuse for it.  Although she belatedly argues in her reply brief that she "was having technical difficulties . . . that may have interfered with her ability to hear Judge Carringer," the portion of the transcript she cites indicates that while at some point during the MSC Greisman apparently had some difficulty entering the Zoom conference, she did not experience further issues once she did connect, including during the time that Judge Carringer announced the settlement terms.

### *Mistake of Fact*

Greisman argues that the settlement agreement should be rescinded under the common law contract principle of mistake of fact.  Initially, while Greisman below sought relief under section 473(b) based on mistake, she did not also seek to rescind the settlement on a theory of mistake pursuant to general contract principles.  Thus, we question whether the latter argument is properly before us.  Even if it were, it lacks merit.

"A party may rescind a contract if his or her consent was given by mistake.  (Civ. Code, § 1689, subd. (b)(1).)  A factual mistake by one party to a contract, or unilateral mistake, affords a ground for rescission in some circumstances.  Civil Code section 1577 states in relevant part: 'Mistake of

fact is a mistake, not caused by the neglect of a legal duty on the part of the person making the mistake, and consisting in:  [¶]  1.  An unconscious ignorance or forgetfulness of a fact past or present, material to the contract . . . .' "  (*Donovan v. RRL Corp.* (2001) 26 Cal.4th 261, 278 (*Donovan*).)  To obtain rescission of the contract, Greisman must establish the following facts:  "(1) [she] made a mistake regarding a basic assumption upon which [she] made the contract; (2) the mistake has a material effect upon the agreed exchange of performances that is adverse to [her]; (3) [she] does not bear the risk of the mistake; and (4) the effect of the mistake is such that enforcement of the contract would be unconscionable."  (*Donovan, supra,* at p. 282.)

Referring generally to the arguments set forth previously in "Sections IV(C)—(D)" of her opening brief, Greisman claims she "already has established the first and second elements" for mistake of fact.  However, the only argument she presents regarding mistake in those sections of her brief is her claim for relief under section 473, subdivision (b).  As recited above, that argument stated—in conclusory fashion and without citation to the record— that Greisman had "apparent confusion regarding the terms 'inclusive' and 'exclusive' while attending a court proceeding via Zoom."  Greisman fails to articulate how this argument satisfies the two elements for rescission due to mistake.

Regarding the third element—that the mistaken party did not bear the risk of mistake—a contracting party bears the risk of a mistake when the agreement so provides, when the party is aware of having only limited knowledge of the facts relating to the mistake but treats this limited knowledge as sufficient, or when the risk is allocated to the party by the court on the ground that it is reasonable in the circumstances to do so.  (*Donovan,*

32

*supra*, 26 Cal.4th at p. 283, citing Rest.2d. Contracts, § 154.)  Greisman does not argue that any of these factors applies.

Finally, as to the fourth element—whether the effect of the mistake is such that enforcement of the contract would be unconscionable—Greisman argues "the enforcement of the settlement agreement was unconscionable because it deprived [her] of her statutory right to collect the mandatory attorneys' fees, costs and expenses under the Song-Beverly Act."  This is a rehash of her argument that the settlement violated Civil Code section 1790.1, an argument that we have deemed forfeited.

### Part IV:  Greisman Is Barred From Challenging the Orders Denying Her Motions for Summary Adjudication

Greisman additionally seeks reversal of the orders denying her two motions for summary adjudication.[8]  As discussed above, Greisman's first motion sought "summary adjudication in his [sic] favor and against Defendant of his [*sic*] first cause of action in the amount of $134,407.64."  Her

---

[8] Defendants argue we lack jurisdiction to review the orders denying her summary adjudication motions because Greisman did not mention them in her notice of appeal.  However, as explained, Greisman did identify (prematurely) the judgment in her notice of appeal, we construed her premature appeal as immediately filed after entry of judgment, and an order on a summary adjudication motion is reviewable in an appeal from the judgment.  (See *Islander Yachts, Inc. v. One Freeport 36-Foot Vessel* (1985) 173 Cal.App.3d 1081, 1086, fn. 6.)  Defendants also cite the rule that a party who consents or stipulates to a judgment is not "aggrieved" by the judgment, thus waives any errors, and therefore may not appeal from the judgment. (See *Papadakis v. Zelis* (1991) 230 Cal.App.3d 1385, 1387, citing *Reed v. Murphy* (1925) 196 Cal. 395, 401 (*Reed*).)  However, a stipulation does not preclude an appeal to determine whether the judgment was authorized by the stipulation.  (*Steinman v. Malamed* (2010) 185 Cal.App.4th 1550, 1555; accord, *Reed, supra*, at p. 399.)  Here, as discussed, Greisman claims that the order granting the section 664.6 motion is different from, or goes beyond, the terms of the parties' stipulation.  Under these authorities, Greisman may seek review of the denial of her summary adjudication motions.

second motion sought "summary adjudication in her favor and against FCA on her second cause of action, including on the issue of the amount of damages," which she identified as $126,529.23. The court denied both motions, finding there were triable issues of fact as to damages.

Greisman contends the trial court's rulings were erroneous because damages is "not an element" of either her first cause of action for failure to repair within a reasonable number of opportunities (Civ. Code, § 1793.2, subd. (d)), or her second cause of action for failure to commence repairs within a reasonable time and/or to repair the vehicle within 30 days (Civ. Code, § 1793.2, subd. (b)).

Greisman relies on *People ex rel. Feuer v. Superior Court* (2015) 234 Cal.App.4th 1360 (*People ex. rel. Feuer*), which involved a claim under the Unfair Competition Law (UCL) that sought civil penalties. The trial court denied the plaintiff's motion for summary judgment or, alternatively, summary adjudication as to the UCL cause of action. (*Id.* at pp. 1365–1367.) It relied on section Code of Civil Procedure section 437c, subdivision (p)(1), which states that For purposes of motions for summary judgment and summary adjudication " ' "(1) A plaintiff . . . has met his or her burden of showing that there is no defense to a cause of action if that party has proved each element of the cause of action entitling the party to judgment on that cause of action." ' " (*People ex. rel. Feuer*, *supra*, at pp. 1366–1367.) In denying the motion, the trial court found that penalties were an element of the plaintiff's UCL cause of action, and that the plaintiff did not present argument and evidence to support its claim for civil penalties. (*Id.* at p. 1367.) The appellate court reversed, holding that penalties were not an element of the cause of action, but rather a remedy. (*Id.* at pp. 1381–1384.)

In a footnote, Greisman also cites *Paramount Petroleum Corp. v.*

*Superior Court* (2014) 227 Cal.App.4th 226, which examined the propriety of an order granting summary adjudication of a breach of contract claim. The court concluded that since a moving party must prove each element to obtain summary adjudication of a cause of action, and since damages are an element of a breach of contract claim, summary adjudication on only the issue of liability for breach of contract, with the amount of damages to be determined later, was improperly granted. (*Id.* at pp. 241, 244.)

Greisman argues her case is similar to *People ex. rel. Feuer* and unlike *Paramount* in that damages are not an element of her first or second causes of action. Then, without elaborating why, Greisman asserts the trial court here "should have granted summary adjudication as to the first and second causes of action, with the determination regarding the type and amount of damages to be determined later through trial."

Defendants argue "the trial court could not have erred in failing to grant relief that was not requested in the motions, and raised now for the first time on appeal." We agree that Greisman has forfeited her claim by failing to raise it in the trial court. (*Greenwich, supra*, 190 Cal.App.4th at p. 767.) While forfeiture is reason alone to disregard her claim (*ibid.*), we find the claim also barred by the doctrine of invited error.

Under that doctrine, "an appellant 'cannot complain of error [she] personally "invited." In other words, one whose conduct induces or invites the commission or error by the trial court is *estopped* from asserting it as a ground for reversal on appeal.' [Citations.]" (*Transport Ins. Co. v. TIG Ins. Co.* (2012) 202 Cal.App.4th 984, 1000.) " ' "[T]he doctrine rests on the purpose of the [estoppel] principle, which is to prevent a party from misleading the trial court and then profiting therefrom in the appellate court. [Citations.]" ' " (*Ibid.*) In both of her motions, Greisman argued she was

entitled to summary adjudication as to her first and second causes of action, "including on the issue of the amount of damages." By definition, "[o]nce summary adjudication has been granted as to an issue, that issue shall be deemed established and the action shall proceed as to the issues remaining." (*Pacific Standard Life Ins. Co. v. Tower Industries, Inc.* (1992) 9 Cal.App.4th 1881, 1887; Code Civ. Proc., § 437c, subd. (n)(1); 6 Witkin, Cal. Procedure (6th ed. 2024) Proceedings Without Trial, §§ 317, 324.) Clearly, then, in filing her motions, Greisman was asking that the court deem the issue of damages established in her favor, and eliminate the need for her to prove the issue at a subsequent trial—the opposite of what she now claims on appeal. Furthermore, although Greisman now argues that damages are not an element of her first and second and causes of action, she appeared to take a different position in her motions.[9] Thus, if it was error for the trial court to rule on Greisman's summary adjudication motions as to the issue of damages, rather than leaving the determination of damages for trial, Greisman invited the error, and cannot be heard to complain about it on appeal.

_____

[9] For example, in her first motion for summary adjudication, she argued "Defendant has either admitted to the elements of [her first] cause of action or there are no genuine disputes of material facts as to the remaining elements," before providing a chart consisting of two columns—the first stating "**ELEMENT**" and the second stating "**EVIDENCE**." "Elements" numbers 1 through 6 address the elements identified in CACI No. 3201, the pattern instruction for a violation of Civil Code section 1793.2, subdivision (d). "Elements" numbers 7 through 12, itemize various types and amounts of damages and civil penalties that Greisman claimed she was entitled to. For example, item numbers 7 and 9 state, respectively, "Plaintiff Miriam Greisman has $3,890.79 in Incidental Damages" and "Plaintiff's actual damages are $37,935.91."

## DISPOSITION

The judgment is affirmed.  Defendants are awarded costs on appeal. (Rule 8.278(a)(2).)

_____

Richman, J.

We concur:

_____

Stewart, P.J.

_____

Desautels, J.

*Greisman v. FCA US, LLC* (A166919)

Trial Court:                                Solano County Superior Court;

Trial Judge:                                Honorable  E. Bradley Nelson;

Attorney for Plaintiff and                  Nemecek & Cole, APC, Vikram
Appellant, Miriam Greisman:                 Sohal, Marshall Cole; Strategic
                                            Legal Practices, APC, Tionna G.
                                            Carvalho;

Attorney for Defendant and                  Horovitz & Levy LLP, John B.
Respondent, FCA US, LLC:                     Sprangers, Lisa Perrochet, Rebecca
                                            G. Powell; Gordon Rees Scully
                                            Mansukhani, LLP, Spencer P.
                                            Hugret, James P. Mayo; Universal
                                            & Shannon, LLP, Jon D. Universal.